DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CASE NO. 5:06 CR 0239 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Michael Lashawn Spragling, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court are motions filed by defendants Michael Spragling and Anthony Groce
(Doc. Nos. 42, 44) and the government's response (Doc. No. 62). The Court conducted a
hearing on September 5, 2006 after which the defendants were permitted to file supplemental
briefs (Doc. Nos. 70, 71). The motions are at issue.

Both Spragling and Groce challenge the April 5, 2006, seizure of $104,000 in U.S.
Currency from a 1984 Chevrolet Caprice. Spragling also seeks to suppress evidence seized
pursuant to a state search warrant on April 5, 2006 at 153 The Brooklands, Akron, Ohio. Groce
seeks dismissal of the entire case against him.

For the reasons set forth below, both motions (Doc. Nos. 42, 44) are denied.

**I. BACKGROUND**

Beginning in 2000, DEA and other law enforcement entities began to collect information
from enforcement activity and confidential sources about the drug dealing activities of defendant
Spragling and others. This is set forth in some detail in the government's brief (Doc. No. 62)
and the detail need not be repeated herein.

(5:06 CR 0239)

As part of the enforcement activities, in November 2005, DEA-Akron received court authorization for a 60-day wiretap of the cellular telephones of Spragling and his known drug enterprise associate, Jonathon Foreman.  As a result of this wiretap and the ongoing investigation, significant amounts of cocaine and marijuana, as well as currency, were seized over time.  These seizures were all related either directly or indirectly to Spragling.

Through DEA's investigation, it became known that Spragling and his inner circle associates often made reference to "the spot" -- which was clearly used in connection with their drug enterprise.  Investigators believed "the spot" to be a "stash" location for drugs and money.  According to Special Agent Kevin Borchert, "the spot" sometimes changed locations.  On January 7, 2006, through intercepted wiretap conversations between Spragling, Groce and Foreman, "the spot" was identified as 153 The Brooklands, Akron, Ohio ("153 The Brooklands").  This is a residence owned by Spragling's girlfriend.

On April 5, 2006, shortly after 6:00 p.m., Detective Tim Harvey of the Akron Police Department's Street Narcotics Uniform Detail ("SNUD"), who was participating in DEA's investigation and who was one of the agents monitoring the wiretap, was directed by his superior, Sergeant Gerald Forney, to conduct a drive-by surveillance at 153 The Brooklands.[1]  Harvey was in an unmarked car.  He observed in the driveway a two-tone Chevrolet Caprice occupied by two black males.  Harvey was familiar with this particular vehicle because he had

---

[1]  This particular surveillance was triggered by information obtained by Sergeant Forney at a meeting earlier that day with Special Agent Borchert and other members of law enforcement.  Borchert asked that the SNUD officers would "go out and refresh probable cause on 153 The Brooklands[.]"

2

(5:06 CR 0239)

seen it at other locations in the course of the drug investigation.  He radioed the license plate to

other SNUD units and related what he had observed.  The license plate came back as being

connected to a vehicle involved in the drug investigation.  Detective Harvey circled back past

153 The Brooklands and observed the vehicle driving west on Adelaide Blvd., with three

occupants.  He followed and ended up behind the Caprice, stopped at the intersection of

Adelaide and Brittain Road.[2]

Detective Harvey testified that, as he pulled to a stop behind the Caprice, a marked

cruiser driven by Detective Chris Carney came into view heading east on Bower Street

approaching the intersection with Brittain (just north of the Adelaide/Brittain intersection).

Harvey believes the occupants of the Caprice saw the marked cruiser.  The Caprice made a

sudden left turn on to southbound Brittain, causing northbound cars on Brittain to slam on their

brakes to avoid a collision.  By now a second marked cruiser driven by Detective Ted Male was

also approaching, heading southbound on Brittain very near the Bower/Brittain intersection.[3]

Both marked cruisers activated their lights and followed the Caprice; Detective Harvey turned

northbound on Brittain and had no further involvement.

Detective Carney is a K9 handler in SNUD.[4]  He was part of the team investigating the

drug activities of Spragling and his associates.  Carney testified that he received the radio call

---

[2] At the hearing, the various witnesses created a drawing of the streets and intersections. This was admitted and marked as Court's Exhibit 1.

[3] Detective Male was also with SNUD and was involved in the drug investigation.

[4] Carney's dog's name is Samson; he is a single-purpose dog, certified to sniff out narcotics.

(5:06 CR 0239)

from Detective Harvey relating his observation of the Caprice at 153 The Brooklands.  Carney

was heading up Bower Street, just north of the Adelaide/Brittain intersection, when he observed

the Caprice dart out on to southbound Brittain, almost causing a collision with oncoming cars.[5]

He activated the lights on his marked cruiser and followed the Caprice, which did not stop.

Carney noticed that the back-seat passenger hunched down in his seated and looked over his

shoulder at the cruiser, while the driver (defendant Groce) and the front-seat passenger

(defendant Spragling) were fumbling around with what Carney believed was an object on the

front seat of the vehicle.  They were also looking over their shoulders.  Detective Male observed

basically the same, testifying that the front and back seat passengers were in hasty conversation

and the front seat passenger was moving around in the front seat.

As the Caprice proceeded to the on-ramp to I-76, Detective Male, fearing a car chase and

possible injury to other motorists in the rush hour traffic, pulled his marked cruiser in front of the

vehicle to block its passage.[6]  Both detectives approached the Caprice, Carney from behind and

Male from the front.  Both Carney and Male testified that they recognized Groce and Spragling,

but not the back-seat passenger later identified as Michael McCrae.  Carney also knew of their

violent histories and threats which they had made with respect to other SNUD officers.

Carney ordered Groce to exit the vehicle, handcuffed him and handed him off to one of

the other detectives now on the scene.  Male did the same with Spragling and, in the process,

---

[5] Detective Carney testified that there is nothing to obstruct the view between the intersections of Adelaide/Brittain and Bower/Brittain.

[6] Detective Ray was also in the car with Detective Male.

4

(5:06 CR 0239)

observed latex gloves, a common tool in the drug trade, protruding from Spragling's left jacket pocket.

By this time, Sergeant Forney and his partner had arrived.  Forney took over the scene; he directed Carney to get Samson to check the vehicle.  Forney also took control of the back-seat passenger, ordering him to exit the vehicle and handcuffing him.  Both Forney and Male testified that they observed a bag on the front passenger side of the vehicle.

Although Samson found no drugs in the car, the dog did alert to the exterior of the driver's side door and then to a blue plastic grocery bag sitting on the passenger side floor. Carney removed the bag from the vehicle and handed it to Detective Williams, another SNUD officer who was involved in the overall investigation and was very familiar with Groce and Spragling.  Williams opened the bag and discovered a large amount of shrink-wrapped money (later determined to be $104,040.00).  No one in the car claimed the bag or the money when Williams inquired as to its owner; however, Groce commented that it was not against the law to have money and Spragling made a statement that he owns a car wash.

Eventually, the vehicle was inventoried and towed; the three individuals who had been in the vehicle were transported to the Akron Police station and detained.  Groce was issued a traffic citation for failure to yield and for having a cracked windshield.

Officers were dispatched to both 153 The Brooklands and to 1228 Delos, Akron, Ohio -- another location linked to Spragling's drug activities -- to secure both locations while search warrants were sought.  Several hours later, an Akron Municipal Court judge authorized search warrants for both locations.  These were executed around 9:00 p.m. on April 5, 2006.  Among

(5:06 CR 0239)

the items seized were heat sealers and plastic bags (for shrink wrapping), blue painter's tape

identical to that found around the money seized from the vehicle, several guns and ammunition,

and six cellular telephones.

State drug charges were filed against Spragling and Groce.  Federal criminal complaints

were prepared subsequently.  McCrae was released.

## II.  DISCUSSION

In his motion (Doc. No. 42), Spragling argues that there was no probable cause to stop

the vehicle on the basis of "a mere turn into another street[ ]" and that, therefore, the subsequent

search of the vehicle violated his Fourth Amendment rights.  He asserts that any evidence seized

must be excluded as the fruit of an illegal stop and search.  He also asserts that evidence seized

from 153 The Brooklands must be suppressed as "fruits of the poisonous tree" because the

search warrant for the residence was obtained as the result of an illegal vehicle stop and, in

addition, the affidavit in support of the warrant lacked any probable cause.  In his supplemental

brief (Doc. No. 71), Spragling asserts that, even if this Court were to view the stop as a

legitimate traffic stop, the subsequent vehicle search exceeded the permissible scope of a traffic

stop search.

Groce similarly argues that there were no reasonable grounds to stop the vehicle, since

there had been no traffic violation, and that any evidence seized from the vehicle should be

excluded as "fruit of the poisonous tree."

Both Spragling and Groce challenge the government's argument that they lack standing.

Clearly, the law is on their side with respect to this issue as it relates to the vehicle stop and no

6

(5:06 CR 0239)

further discussion is required.[7]  See  Whren v. United States, 517 U.S. 806, 809-10 (1996)

(temporary detention of individuals during the stop of an automobile, no matter how brief,

constitutes a "seizure" within the meaning of the Fourth Amendment); United States v. Perez,

440 F.3d 363, 369 (6th Cir. 2006) (because vehicle seizure affects the Fourth Amendment

interests of all the occupants, both driver and passengers may challenge the stop).

The Perez case also supplies guidance to this Court on the overall question of the

legitimacy of the stop of the Caprice, which is challenged by both defendants.

In the instant case, officers testified at the hearing that they stopped the Caprice because

they observed an unsafe and sudden left turn, in front of and across on-coming traffic, which

forced that on-coming traffic to brake to avoid a collision.  However, they also admitted that,

because of their familiarity with the vehicle in the course of the ongoing drug investigation, they

probably would have conducted an investigatory stop even if they had not observed the traffic

violation.  In fact, Detective Carney testified that there was a preconceived plan to stop the

vehicle.

Perez involved a challenge to the district court's denial of a motion to suppress evidence

seized following a traffic stop.  In Perez, the court stated:

> While Officer Johnson testified that he stopped the Escalade for failing to
> use a turn signal when changing lanes, there was also testimony that the drug
> interdiction unit was directed to conduct an investigative stop even if there was no
> traffic violation.  If there is probable cause to believe a traffic violation had
> occurred, the officer's actual motivation is immaterial.  Whren, 517 U.S. at

---

[7]  The Court will address later in this opinion the government's separate argument that
Spragling does not have standing to challenge the search of 153 The Brooklands.

(5:06 CR 0239)

> 812-13, 116 S.Ct. 1769;  United States v. Ferguson, 8 F.3d 385, 391 (6th
> Cir.1993) (en banc ). . . .

Perez, 440 F.3d at 370.  The same legal principles apply in this case.  Whether or not there was a

plan to stop the Caprice, the officers all agree that they observed a traffic violation that supplied

justification for stopping the vehicle.

> Perez goes on to note:

> . . . An ordinary traffic stop is like an investigative detention, the scope of which
> is governed by Terry principles.  United States v. Hill, 195 F.3d 258, 264 (6th
> Cir.1999).  Once the purpose of an ordinary traffic stop is completed, the officer
> may not "further detain the vehicle or its occupants unless something that
> occurred during the traffic stop generated the necessary reasonable suspicion to
> justify a further detention."  United States v. Mesa, 62 F.3d 159, 162 (6th
> Cir.1995);  see also Erwin, 155 F.3d at 822.

Id.  The Court must examine the totality of the circumstances when judging whether officers

"had an objective and particularized basis for suspecting criminal wrongdoing."

> Under Terry, an officer is permitted to "stop and briefly detain a person
> for investigative purposes if the officer has a reasonable suspicion supported by
> articulable facts that criminal activity'"may be afoot,' even if the officer lacks
> probable cause."  United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104
> L.Ed.2d 1 (1989) (quoting Terry, 392 U.S. at 30, 88 S.Ct. 1868).

Id.  In considering the totality of the circumstances, this Court must "determine whether the

individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual

factor is entirely consistent with innocent behavior when examined separately."  United States v.

Smith, 263 F.3d 571, 588 (6th Cir.2001).  Furthermore, agents are certainly permitted to draw on

their knowledge and experience when determining whether they have an objective and

particularized basis to stop and search.  United States v. Arvizu, 434 U.S. 266, 273-74 (2002)

("This process allows officers to draw on their own experience and specialized training to make

(5:06 CR 0239)

inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'") (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

In this case, there was a lengthy and ongoing investigation of drug activities relating to Spragling and his associates.  The investigation included controlled purchases of narcotics, seizures pursuant to warrant, Title III wiretaps and interceptions, revelation of the whereabouts of "the spot" believed to be a "stash" house for drug and drug proceeds, and observation at "the spot" of a vehicle known to have been involved in drug transactions.  Prior to the stop of the vehicle due to the traffic infraction, when the occupants saw the activated cruiser lights and knew they were being pulled over, they were observed to be engaged in urgent conversation and furtive behaviors, making it appear that they were hiding something.

The officers had a reasonable basis to suspect that drugs and/or drug proceeds were in the vehicle.  As a result, the use of the drug-sniffing dog to investigate that possibility was perfectly reasonable and minimally invasive.  Once the dog alerted, probable cause was established to search the vehicle and the plastic bag found in the vehicle.  United States v. Diaz, 25 F.3d 392, 393-94 (6th Cir. 1994).

In view of the totality of these circumstances, the Court concludes that there was a legitimate stop and search of the Caprice.

Finally, Spragling seeks to suppress evidence seized from the execution of the search warrant at 153 The Brooklands.  The government argues that he has no standing to challenge this search because he cannot establish a reasonable expectation of privacy in the place searched.

(5:06 CR 0239)

Spragling argues that, although the residence is owned by his girlfriend, he was a regular overnight guest there and kept several of his personal effects there.  This, he asserts, is sufficient to give him an expectation of privacy with respect to the residence.  The Court will not examine this issue exhaustively but will, for purposes of this motion, simply accept that Spragling has standing.

Spragling challenges the search of 153 The Brooklands on two grounds: (1) that evidence seized there was the "fruit of the poisonous tree" of an illegal stop and search of the Caprice; and (2) that the affidavit in support of the application for the search warrant was lacking in probable cause.  The Court rejects the first argument because it has already determined that the stop and search of the Caprice was legal.

As for the second argument, Spragling claims that the affidavit failed to show that any criminal activities were committed, or being committed, at the residence.  He attaches to his motion a copy of the Affidavit for Search Warrant.

Probable cause for the issuance of a search warrant exists if the supporting affidavit recites facts and circumstances indicating "a fair probability that evidence of a crime will be located on the premises of the proposed search."  United States v. Bowling, 900 F.2d 926, 930 (6th Cir.), cert. denied, 498 U.S. 837 (1990).  In evaluating the issuing judge's probable cause determination, the Court applies a flexible "totality of the circumstances" approach, which permits evaluation of the particular facts of each case.  Illinois v. Gates, 462 U.S. 213, 238 (1983).

(5:06 CR 0239)

The affidavit stated that the affiant, Detective M.V. Gilbride, "believes and has good cause to believe that evidence, to wit: U.S. Currency, records and documents are being illegally possessed within 153 The Brooklands[.]" It set forth several facts in support of this belief: that he participated with others in undercover surveillance at 153 The Brooklands as the result of a Title III wiretap; that the Caprice had been observed at the residence as part of this undercover surveillance; that, occupied by three black males, it left the residence on April 5, 2006;[8] that it was shortly thereafter observed committing a traffic violation; that, at first, the driver did not pull over in response to the lights and sirens of marked police cruisers; that before the vehicle finally stopped, uniformed officers observed the three occupants making furtive movements; that after the vehicle stopped a drug-sniffing dog alerted during an open air sniff to the presence of narcotics; that a blue bag in plain view on the front passenger side floorboard contained an extremely large sum of money which was heat sealed and banded together in packets; that his experience and training made him aware that this is a common method by which narcotics traffickers package their drug proceeds; that, as a result of the same wiretap pursuant to which 153 The Brooklands was under surveillance, similarly packed currency in the amount of $248,000 had been previously seized; and that Spragling and Groce both had previous drug trafficking arrests. Through training and experience, the affiant knew that drug dealers frequently maintain readily available, substantial sums of money so as to finance their drug

---

[8] The affidavit actually stated that these events occurred on April 7, 2006. No one disputes that this is an error.

11

(5:06 CR 0239)

dealing, and sometimes attempt to legitimize their drug proceeds through the use of false or

fictitious business records and sham business operations.

Under the totality of the circumstances analysis and drawing upon reasonable inferences,

the Court concludes that the search warrant was supported by probable cause.


## III.  CONCLUSION

Having considered the arguments and the evidence, the Court concludes that there is no

basis on which to grant either of the defendant's motions and, therefore, both motions (Doc. Nos.

42, 44) are denied.


IT IS SO ORDERED.


 September 19, 2006                           *s/ David D. Dowd, Jr.*
Date                                          David D. Dowd, Jr.
                                              U.S. District Judge